1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
                              AT SEATTLE

9

10    CARL KNIGHT,                              CASE NO. C10-0753JLR

11                    Plaintiff,                ORDER ON MOTIONS FOR
                                                SUMMARY JUDGMENT
12            v.

13    KATHY BROWN, et al.,

14                    Defendants.

15          This matter comes before the court on Defendants King County, Kathy Brown,

16    Ameer Faquir, Dave Stamper, and Dan Kenoyer's (collectively, the "King County

17    Defendants") amended motion for summary judgment (Dkt. # 66 ("KC Mot.")) and

18    Defendant Gene Willard's motion for summary judgment (Dkt. # 46 ("Willard Mot.")).

19    Plaintiff Carl Knight opposes both motions.  (Dkt. ## 68 ("KC Resp."), 71 ("Willard

20    Resp.").)  Having considered the submissions of the parties, the record, and the governing

21    law, and having heard oral argument, the court GRANTS in part and DENIES in part the

22

King County Defendants' motion for summary judgment (Dkt. # 66) and GRANTS in part and DENIES in part Mr. Willard's motion for summary judgment (Dkt. # 46).

## I.    BACKGROUND:

**A.    Mr. Knight's Employment and Promotion**

King County security officers, dispatchers, and security sergeants are employees of King County's Facilities Management Division ("FMD"), and work within the Security Unit of FMD's Building Services Section.  The Security Unit is responsible for security in King County governmental buildings, including the King County Courthouse and the King County Youth Services Center ("YSC") in Seattle, Washington and the Maleng Regional Justice Center ("RJC") in Kent, Washington.

Mr. Knight, an African-American man, began working in FMD as a part-time security officer in 1990.  (1/24/11 Knight Dep. 68.[1])  In 1997, Mr. Knight injured his back in a car accident and was limited for medical reasons to work assignments that did not involve a risk that he could re-injure himself during a hostile encounter with the public.  (Stamper Decl. (Dkt. # 56) ¶ 6.)  Accordingly, Mr. Knight was reassigned to work as a part-time dispatcher in the Security Unit.  (Stamper Decl. ¶ 8 & Ex. B; 1/25/11 Knight Dep. 119.)

---

[1] The parties have submitted multiple excerpts of Mr. Knight's depositions.  (Stockdale Decl. (Dkt. # 64) Ex. B (1/25/2011 Knight Dep., 2/18/2011 Knight Dep. & 3/7/2011 Knight Dep.); *id.* Ex. C (1/24/2011 Knight Dep.); Scully Decl. (Dkt. # 69) Ex. G (1/24/2011 Knight Dep.); *id.* Ex. H (1/25/2011 Knight Dep.); *id.* Ex. I (2/18/2011 Knight Dep.); *id.* Ex. J (3/7/2011 Knight Dep.).)  The court cites to the date of Mr. Knight's depositions rather than to counsel's declarations.

1       In 2007, Mr. Knight asked the Chief of the Security Unit, Defendant Dave

2   Stamper, if he could serve as acting sergeant when security sergeants were absent.

3   (Stamper Decl. ¶ 5.)  Mr. Stamper told Mr. Knight that he could not, because he lacked

4   the necessary training, was not on the acting sergeant's list because he had not applied to

5   be a sergeant, and his medical restrictions prevented him from performing the full duties

6   of a security officer.  (1/24/11 Knight Dep. 100, 109; Stamper Decl. ¶¶ 5-6.)  Mr. Knight

7   did not apply for an acting sergeant position at that time.[2]  (*See* Stamper Decl. ¶¶ 4, 11 &

8   Ex. A.)

9       In March 2007, King County posted a job announcement for a new third-shift

10  security sergeant position.  (*See* 2d Faquir Decl. (Dkt. # 76) Ex. A.)  The announcement

11  stated that King County would also use the recruitment process to identify candidates to

12  "fill similar vacancies" as they became available.  (*Id.*)  Until this time, there were only

13  two security sergeants:  Defendant Gene Willard, who worked at the King County

14  Courthouse, and Sergeant Greg Meyer, who worked at the RJC.  (Kenoyer Decl. (Dkt. #

15  55) ¶ 12.)  Mr. Knight obtained a medical release that would allow him to work the full

16  duties of a sergeant, and applied for the sergeant position.  (Stamper Decl. ¶ 12 & Ex. C.)

17      Mr. Knight was the highest ranking candidate for the sergeant position.  (Faquir

18  Decl. (Dkt. # 51) ¶ 16.)  Mr. Stamper and Defendant Ameer Faquir, the manager of the

19  Building Services Section, were members of the panel that recommended Mr. Knight's

20  promotion.  (*Id.*)  Mr. Faquir forwarded their recommendation to Defendant Kathy

21

22          [2] Mr. Knight stated at oral argument that he does not bring any claims based on his
    experiences before he was a security sergeant.

Brown, director of FMD, who approved Mr. Knight's promotion.  (*Id.*)  Mr. Knight's promotion to sergeant became effective in February 2008.  (*Id.* ¶ 15.)  Larry Martin, a Caucasian security officer, who had also applied for the sergeant position, was placed on a list of candidates to serve as acting sergeant when other sergeants were sick or on vacation.  (Kenoyer Decl. ¶ 8.)

According to King County's Classification Specification ("Specification") for the Security Sergeant position, the responsibilities of a security sergeant "include supervising, training and evaluating security staff," as well as "assign[ing] and schedule[ing] work and implement[ing] security programs, policies and procedures." (Scully Decl. (Dkt. # 69) Ex. C ("Willard Dep."), Ex. 1.)  The Specification also states, "The Security Sergeant is the first line supervisory level responsible for supervising, scheduling, training, reviewing and disciplining subordinate security staff and making recommendations to the Security Chief for hiring, discipline and performance improvement and termination."  (*Id.*)  The Specification includes, as examples of duties that "may vary by position," the following:

> 1. Supervise assigned staff by performing or participating in the following personnel responsibilities: training, staff selection, recommending and/or implementing disciplinary actions, responding to grievances, recommending termination, attending unemployment hearings and assisting with labor relations issues.  Evaluate and document work performance formally and informally; coach, counsel, monitor, and motivate assigned staff.  Establish and/or prepare staffing schedules.  Collect and verify employee timesheets.
>
> 2. Assign, schedule and deploy personnel; develop work schedules for contract security; report needs for personnel.

(*Id.*)

FMD security sergeants, officers, and dispatchers belong to the same union—
International Brotherhood of Teamsters, Local 117—and are subject to the same
collective bargaining agreement ("CBA"). (Faquir Decl. ¶ 14 & Ex. B.) The CBA
provides a uniform process for discipline and appeals of disciplinary decisions. (*Id.*) The
CBA also covers employee working conditions and specifies that shift, furlough, and post
assignments are based on seniority. (*Id.*) Mr. Willard, the most senior sergeant, was the
first-shift sergeant and was assigned to King County Courthouse. (Kenoyer Decl. ¶ 12.)
Sergeant Meyer, the second-shift and second most senior sergeant, was assigned to the
RJC. (*Id.*) Mr. Knight was the least senior of the three sergeants, and worked the third
shift at the King County Courthouse. (Faquir Decl. ¶ 15.) Because Mr. Knight worked
the third shift, most King County facilities were closed to the public during his shift.
(Kenoyer Decl. ¶ 12.)

Mr. Knight was subject to a six-month probationary period after his promotion to
sergeant. Mr. Stamper directed Mr. Willard to train Mr. Knight in the duties of a security
sergeant during Mr. Knight's probationary period. (Scully Decl. Ex. D ("Stamper Dep.")
37-38, 53-54; Willard Decl. (Dkt. # 48) ¶ 8; Knight Decl. (Dkt. # 70) ¶ 6.) Mr. Stamper
gave Mr. Willard discretion to delegate some of the work that he was doing to Mr.
Knight. (Stamper Dep. 54.) Mr. Willard also provided feedback to management on Mr.
Knight's progress. (Willard Dep. 19.) During his probationary period, Mr. Knight
received three positive performance evaluations from Mr. Stamper, Mr. Faquir, and

1 Defendant Dan Kenoyer.  (Faquir Decl. ¶ 17 & Ex. C.)  Mr. Knight successfully passed

2 his probationary period and became a career service security sergeant.  (*Id.*)

3 **B.    Data Unit/AFIS Incident**

4 On October 17, 2008, Mr. Knight used his access card to enter the King County

5 Sheriff's Office Data Control Unit ("Data Unit").  (*See* Pompeo Decl. (Dkt. # 61) ¶ 12.)

6 The Data Unit is responsible for entering warrants, domestic violence protection orders,

7 and stolen vehicle information into the state and nationwide law enforcement databases.

8 (*Id.* ¶ 2.)  Because the Data Unit receives and maintains sensitive criminal history

9 information, it is a secure area with restricted entry and is not open to the public.  (*Id.* ¶

10 3.)  Mr. Knight asked two Data Unit employees for help obtaining information about a

11 warrant for a fugitive named Allen Andre Williams on behalf of Seattle Bonding

12 Company, a private company.  (Carumbana Decl. (Dkt. # 67) ¶¶ 2-6, Cook Decl. (Dkt. #

13 54) ¶¶ 5-6.)  One of the Data Unit employees told Kathryn Pompeo, director of the Data

14 Unit, about Mr. Knight's request for information about Mr. Williams.  (Pompeo Decl. ¶

15 15.)  Ms. Pompeo in turn reported Mr. Knight's entry to Captain Kent Baxter of the King

16 County Sheriff's Office Internal Investigations Unit.  (*Id.*)

17 On October 20, 2008, Mr. Knight entered the Sheriff's Office Automated

18 Fingerprint Identification System ("AFIS") Unit to ask for a fingerprint comparison to

19 identify Mr. Williams.  (1/25/11 Knight Dep. 78-79.)  The AFIS technicians determined

20 that the request on behalf of the private bail bond company was not proper, and refused to

21 help Mr. Knight.  (Sasse Decl. (Dkt. # 62) ¶ 8.)

22

1      Ms. Pompeo and Captain Baxter were initially concerned that Mr. Knight's entry

2   into the Data Unit and AFIS ("the Data Unit/AFIS incident") and his requests for

3   information about Mr. Williams might have violated the law; they concluded, however,

4   that his requests were inappropriate but not unlawful.  (Pompeo Decl. ¶¶ 15-16.)  Ms.

5   Pompeo obtained statements from the people who interacted with Mr. Knight in the Data

6   and AFIS Units and sent them to Mr. Stamper.  (*Id.* Ex. B.)  In addition, Captain Baxter

7   sent an official complaint against Mr. Knight to Mr. Stamper, who forwarded the

8   complaint to Mr. Faquir.  (Faquir Decl. ¶¶ 5-6, Stamper Decl. ¶ 13.)  Ms. Brown and Mr.

9   Faquir hired an outside investigator, Patricia Eakes, to investigate the Sheriff's Office's

10  complaint.[3]  (Brown Decl. (Dkt. # 52) ¶¶ 8-9; Faquir Decl. ¶¶ 7, 10-11.)

11  **C.     Mr. Knight's October 2008 Grievance**

12      On October 29, 2008, after Ms. Pompeo initiated the investigation of Mr. Knight's

13  entry into the Data Unit and AFIS, Mr. Knight's union filed a grievance alleging that Mr.

14  Knight was being treated disparately as a security sergeant.  (*See* Faquir Decl. Ex. D.)

15  The grievance alleged that Mr. Knight was:

16          not being provided the full breadth of responsibility inherent in his position
            as a Security Sergeant.  Mr. Knight was offered and accepted a position as
17          Sergeant earlier this year but has been given rather limited duties and
            responsibilities as opposed to the other Sergeants.  Additionally, duties
18          have been removed from Sergeant Knight and assigned to others outside
            the bargaining unit.

19

20
    _____

21      [3] Ms. Eakes had earlier been retained by FMD to investigate Mr. Knight's complaint
    about sexually inappropriate comments made to him by a female security officer.  (Faquir Decl.
22  ¶ 10.)  As a result of Ms. Eakes's investigation, the female officer was discharged.  (*Id.*)

1  (*Id.*)  The grievance does not state any specific examples of conduct attributable to

2  discrimination.  Mr. Faquir assigned Bob Doyle, FMD's human resources analyst, to

3  investigate the grievance.  (Faquir Decl. ¶ 20.)

4  **D.    The "Sad Day" Comment**

5  In January 2009, Mr. Knight learned from security officer Jim Haynes that, when

6  Mr. Knight was promoted in February 2008, Mr. Willard said, "It is a sad day for King

7  County when a black man is promoted over a white man" ("the 'sad day' comment").[4]

8  (2/18/11 Knight Dep. 206; Scully Decl. Ex. J ("Haynes Dep.") 22, 24.)  Mr. Knight did

9  not hear the "sad day" comment, it was not made in his presence, and he was not aware

10  of the comment until Mr. Hayes told him about it.  (2/18/11 Knight Dep. 206.)  Mr.

11  Knight did not report Mr. Willard's comment to his managers when he learned about it

12  because he hoped his work environment would improve.  (Knight Decl. ¶ 8.)

13  **E.    Officer Lonnie Hampton Incident**

14  In late February or early March 2009, Mr. Knight wrote a memo to Officer Lonnie

15  Hampton because he saw Officer Hampton improperly using a security camera to zoom

16  in on women's body parts.  (2/18/2011 Knight Dep. 272, 288-91.)  Officer Hampton, who

17  is African-American, complained to Mr. Kenoyer about the memo.  Mr. Kenoyer

18  reviewed the video record for the security camera, interviewed other security officers and

19  concluded that there was no basis for Mr. Knight's allegation that Officer Hampton had

20

21  _____

   [4] Mr. Willard denies that he ever made the "sad day" comment, but concedes that the
22  court must accept that he made it for the purposes of this motion.  (Willard Decl. ¶ 5, Willard
   Mot. at 3.)

used the camera inappropriately.  (Kenoyer Decl. ¶¶ 20-22 & Ex. A.)  Mr. Kenoyer told

Mr. Knight that sergeants did not have authority to issue a written memo or reprimand to

a security officer and were required to follow the chain of command.  (*Id.* ¶ 22; 2/18/11

Knight Dep. 292.)  Mr. Willard testified that he spoke to Officer Hampton about the

incident and told him not to do it again.  (Willard Dep. 50-51.)

**F.      King County's Investigations**

Beginning in October 2008, FMD conducted two parallel investigations involving

Mr. Knight: Ms. Eakes's investigation of the Data Unit and AFIS incidents, and Mr.

Doyle's investigation of Mr. Knight's grievance regarding disparate treatment.

1.      Data Unit/AFIS Incident

Ms. Eakes completed her investigation of the Data Unit/AFIS incident in January

2009.  (Faquir Decl. Ex. A ("Eakes Report").)  Ms. Eakes found that Mr. Knight had

improperly attempted to use his Access card and his status as a security sergeant to obtain

information from King County on behalf of a private entity.  (*Id.*)  Ms. Eakes concluded

that Mr. Knight's efforts on behalf of Seattle Bonding Company violated the King

County Code of Ethics and the FMD Security Policy and Procedures.  (*Id.*)

Based on the Eakes Report, and in consultation with Anita Whitfield, director of

King County's Human Resources Division, Ms. Brown and Mr. Faquir proposed that Mr.

Knight's employment with King County be terminated.  (*See* Brown Decl. ¶¶ 17-18.)  On

March 3, 2009, Ms. Brown sent a letter to Mr. Knight explaining the reasons for the

proposed termination.  (Faquir Decl. Ex. I.)  On March 24, 2009, King County conducted

a *Loudermill* hearing regarding Mr. Knight's proposed termination.  (*Id.* ¶ 26.)  During

this hearing, Mr. Knight told Mr. Faquir that Seattle Bonding Company did not pay him

to assist with the fugitive warrant, and that he did not know it was wrong to enter the

Data Unit and AFIS. (*Id.*) Mr. Knight told Mr. Faquir that he would obtain a declaration

from Lucille Fisher, the owner of Seattle Bonding Company, to clarify his relationship

with Seattle Bonding Company. (*Id.* ¶ 27.) Mr. Faquir agreed to keep the hearing open

to consider Ms. Fisher's declaration. (*Id.*)

Ultimately, Ms. Brown and Mr. Faquir, in consultation with Ms. Whitfield,

decided to demote and suspend Mr. Knight rather than terminate his employment. (*See*

Faquir Decl. Ex. C.) Ms. Brown and Mr. Faquir state that they decided on the lesser

discipline based on Mr. Knight's representation that he was not paid by Seattle Bonding

Company and based on Mr. Knight's many years of service to King County. (*See* Brown

Decl. ¶ 19; Faquir Decl. ¶ 26.) Mr. Knight was demoted to dispatcher effective June 5,

2009, and was suspended without pay for 20 days. (*See* Faquir Decl. Ex. I.)

After Mr. Knight was demoted to dispatcher, Ms. Brown and Mr. Faquir appointed

Alphonso "Al" Hampton, an African-American security officer, as acting security

sergeant to cover Mr. Knight's duties. (*Id.* ¶ 31.) Ms. Brown and Mr. Faquir later

promoted Al Hampton to full-time sergeant to replace Mr. Knight. (*Id.*)

2. <u>Mr. Knight's Union Grievance</u>

Concurrently with Ms. Eakes's investigation of the Data Unit/AFIS incident, Mr.

Doyle investigated Mr. Knight's union grievance. In March 2009, at a meeting regarding

Mr. Knight's grievance, Mr. Knight told Mr. Faquir and Mr. Doyle about the "sad day"

comment. (*See* Faquir Decl. ¶ 20.) Mr. Faquir and Ms. Brown hired an outside

investigator, Beth Dolliver, to investigate Mr. Knight's complaint about the "sad day" comment and to assume the investigation of Mr. Knight's grievance. (Faquir Decl. ¶ 23.)

At some point, Ms. Dolliver reported to FMD the results of her interviews with Officer Haynes and a second officer who allegedly was present when Mr. Willard made the "sad day" comment. (*See id.* Ex. G ("Dolliver Report").) FMD managers interviewed Mr. Willard and determined that he had made the "sad day" comment. (*See id.; see also* 2d Brown Decl. (Dkt. # 78) Ex. A.) On May 19, 2009, based on this finding, and in consultation with Ms. Whitfield, Ms. Brown and Mr. Faquir proposed demoting and suspending Mr. Willard for making the "sad day" comment. (Brown Decl. ¶¶ 14-15; 2d Brown Decl. Ex. A.) On May 25, 2009, Mr. Willard elected to retire rather than take the demotion. (Willard Decl. ¶¶ 5-6.) Mr. Willard later attempted to clear his record of the comment, but his request was denied. (Faquir Decl. Ex. H.)

In September 2009, Ms. Dolliver completed her investigation of Mr. Knight's disparate treatment grievance. (*See* Dolliver Report.) Ms. Dolliver concluded that Mr. Knight had not been subjected to disparate treatment as a security sergeant. (*See id.*)

3. Mr. Knight's EEOC Charge

On May 22, 2009, Mr. Knight filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Knight Decl. Attach. A.) Mr. Knight alleged in his charge that he believed he had been subjected to disparate terms and conditions of employment based on his race and his age. (*Id.*)

On June 5, 2009, Mr. Knight filed another charge of discrimination with the EEOC, alleging retaliation for his May 22, 2009 filing with the EEOC. (*See* Am. Compl.

(Dkt. # 27) ¶ 55.)  In addition, Mr. Knight's union filed grievances regarding Mr. Knight's demotion and suspension and alleging the untimely payment of overtime to Mr. Knight.  (*See* 2d Faquir Decl. ¶ 4.)  Mr. Knight's union later withdrew both of these grievances, along with Mr. Knight's October 2008 grievance.  (*Id.*)

The EEOC issued a right-to-sue letter in January 2010.  (Am. Compl. ¶ 55.)  On April 6, 2010, Mr. Knight filed the instant lawsuit in King County Superior Court.  (*See* Not. of Removal (Dkt. # 1).)  On May 4, 2010, Defendants removed Mr. Knight's lawsuit to this court.  (*Id.*)

**G.    Facts Regarding Discrimination**

Mr. Knight describes a number of actions by each of the Defendants which he alleges contributed to disparate treatment on the basis of race, a racially hostile work environment, or retaliation for filing his union grievance and his EEOC charges.  At oral argument, Mr. Knight clarified that his claims are based solely on the discrimination he allegedly experienced during his employment as a sergeant.

1.  Mr. Willard

Mr. Willard, who is Caucasian, was the most senior of the three security sergeants, having been promoted from security officer to sergeant in 2005, and worked the first shift at the King County Courthouse.  (Willard Decl. ¶ 1-2.)  King County determined that Mr. Willard made the "sad day" comment when Mr. Knight was promoted to sergeant.  (*See* 2d Brown Decl. Ex. A.)  Mr. Knight also states that Mr. Willard expressed displeasure when King County was renamed in honor of Martin Luther King, Jr. in 2005.  (1/24/11 Knight Dep. 145-46.)  Although Mr. Knight testified that Mr. Willard did not indicate

that he was displeased because Dr. King was a black man, Mr. Willard's comment led Mr. Knight to believe that Mr. Willard was racist.  (*Id.*)

Mr. Knight's primary allegations against Mr. Willard are that he either removed or never gave him responsibility for scheduling security officers and for managing security officers' timesheets, which he contends were "key responsibilities" of a security sergeant. (Willard Resp. at 7 (citing Willard Dep. Ex. 1).)  With respect to scheduling, only Mr. Willard ever managed the master schedule for the security officers.  Mr. Knight acknowledges that Mr. Willard was responsible for the master schedule before Mr. Knight was hired, and that historically there was only one scheduling sergeant.  (3/7/11 Knight Dep. 342-43.)  Mr. Knight, meanwhile, was responsible for making adjustments within his shift.  (*Id.* at 344.)  With respect to security officers' timesheets, Mr. Willard assumed Mr. Knight's responsibility for managing the timesheets for two of the officers who worked on his shift.  (Willard Dep. 46-48.)  Mr. Willard testified that the two officers, both of whom are African-American, asked him to take over their time sheets because Mr. Knight did not review the sheets accurately and approve them on time, and that he took over the timesheets for the two officers "for the purpose of keeping morale in the organization."  (*Id.*)

Mr. Knight also alleges that Mr. Willard countermanded his authority to discipline security officers on two separate occasions.  First, Mr. Knight cites the Lonnie Hampton incident described above.  (2/18/2011 Knight Dep. 272, 288-91.)  Second, Mr. Knight points to an incident in which he asked that one of the day-shift officers be formally disciplined for putting too much detail in the logbook.  (Willard Dep. 48-49; 2/18/11

Knight Dep. 246-47.)  Rather than formally discipline the officer as Mr. Knight

requested, however, Mr. Willard spoke to the officer and told him to "grow up and make

a decent log."  (Willard Dep. 50; *see* Knight Decl. ¶ 15.)

Mr. Knight also states that Mr. Willard, along with Mr. Stamper and Mr. Kenoyer,

excluded him from informal meetings in which they made management decisions that

affected the security officers.  Mr. Willard and Mr. Stamper testified that they would on

occasion "have a five-minute meeting or go down and grab a cup of coffee."  (Stamper

Dep. 50; *see also* Willard Dep. 44-45.)  Both testified that they were able to meet

informally or get coffee because they both worked the day shift, while Mr. Knight did not

have that opportunity because he worked the night shift.  (Stamper Dep. 50; Willard Dep.

45-46.)  Mr. Knight does not identify which management decisions were made in these

meetings.

Finally, Mr. Knight testified that Mr. Willard controlled the shared sergeants'

office and occasionally took the only key to the shared desk home with him, thus

depriving him of access to materials he needed for work.  (Knight Decl. ¶ 6; *see* Stamper

Dep. 61 (agreeing that Mr. Willard had primary responsibility for the office).) [5]

---

[5] Mr. Knight discusses two additional events in his brief, but the evidence does not
support the brief's characterization of the events.  First, Mr. Knight states that Mr. Willard and
Mr. Kenoyer "allowed Knight to perform overtime work, then denied him pay, asserting falsely
that the overtime had not been approved."  (KC Resp. at 6; Willard Resp. at 4.)  In support of this
statement, however, Mr. Knight cites pages of his depositions that are either not in the record
before the court or that do not discuss overtime.  (*See* KC Resp. at 6 (citing 1/25/11 Knight Dep.
155-57 (discussing Mr. Knight's relationship with Ms. Fisher of Seattle Bonding Company));
KC Resp. at 19 (citing 1/26/11 Knight Dep. 155-57 (not in the record)); Willard Resp. at 4
(citing 1/24/11 Knight Dep. 155-57 (not in the record)).)  In addition, Mr. Knight states that Mr.
Willard falsely reported that he had left work early when he knew that it was not true.  KC Resp.

## 2. Mr. Stamper

Mr. Stamper, who is Caucasian, was Security Chief when Mr. Knight applied for his promotion and during his probationary period. As Security Chief, Mr. Stamper supervised the security sergeants. (Stamper Dep. 7.) Mr. Stamper retired from King County in November 2008. (*Id.* at 5.)

Mr. Knight asserts that several of Mr. Stamper's management practices were discriminatory. First, Mr. Knight points to evidence that, after he was hired, Mr. Stamper continued to hold the weekly mandatory sergeants' meetings at noon on Wednesdays, as he had done before Mr. Knight was hired. (*Id.* at 13.) Because Mr. Knight worked the night shift, this effectively meant that Mr. Knight had to attend meetings during his sleep time. (*See* 2/18/11 Knight Dep. 323 (stating his work hours).) Mr. Knight has not cited any evidence that he complained about the noon meetings. Second, Mr. Knight points to evidence that only Mr. Willard served as acting chief when Mr. Stamper or Mr. Kenoyer was not available. (*Id.* at 63.) Mr. Stamper testified that Mr. Willard served as acting chief because he was the most senior of the three sergeants. (*Id.*) Third, Mr. Stamper did not give Mr. Knight his own office, desk, and computer.[6] (*Id.* at 62.) Fourth, Mr. Knight

---

at 6. The cited pages of Mr. Knight's deposition do not state that Mr. Willard knew why Mr. Knight left early that day. (*See* 1/24/11 Knight Dep. 158-59.) In any event, King County has offered evidence that Mr. Knight worked far more overtime than the other two sergeants. (Hairston Decl. (Dkt. # 60 ¶ 3.)

[6] Mr. Knight states in his brief that he was forced to share an email address with Mr. Willard and that his requests for his own email were denied. (KC Resp. at 8, 19.) The court has not found evidence of the shared email address in the record; the evidence cited by Mr. Knight does not support this contention. (*See* Stamper Dep. 61-62 (discussing shared office); 1/24/11 Knight Dep. 226-27 (stating he was locked out of Outlook); 2/18/11 Knight Dep. 222-23

again points to evidence that Mr. Stamper, along with Mr. Willard and Mr. Kenoyer, excluded him from informal meetings on the basis of Mr. Knight's race (see above).

In addition, Mr. Knight contends that Mr. Stamper had direct or indirect supervisory responsibility over Mr. Willard and failed to exercise that authority to stop Mr. Willard's discriminatory conduct. (KC Resp. at 22-23 (citing Stamper Dep. 5-7).) Mr. Knight states that he complained to Mr. Stamper during his tenure as a sergeant about Mr. Willard "removing work responsibilities and countermanding [his] attempts to correct the behavior of officers."[7] (Knight Decl. ¶ 7.) He does not point to an instance in which he told Mr. Stamper that he was concerned that Mr. Willard was discriminating against him. Mr. Stamper testified that he knew that Mr. Knight and Mr. Willard did not get along, but that Mr. Knight did not say that he thought Mr. Willard was racist.[8] (Stamper Dep. 27.)

---

(discussing counseling); *id.* at 281 (discussing shared office); *id.* at 282 (not in the record); Willard Dep. 46 (discussing shared desk); *see also* Hairston Decl. (Dkt. # 75) ¶ 4 & Ex. C (Mr. Knight had his own email address as early as 2001).)

[7] In his response, Mr. Knight discusses an incident in which Mr. Stamper did not select him as acting sergeant. The court does not belabor this incident here. First, the acting sergeant incident occurred before Mr. Knight's appointment to sergeant. Mr. Knight's counsel clarified at oral argument, however, that Mr. Knight's claims are based only on Mr. Knight's treatment as a security sergeant. Second, King County has presented evidence that Mr. Knight was not appointed acting sergeant because his medical restrictions at the time prohibited him from being an acting sergeant and because he did not apply to be on the acting sergeant list.

[8] Mr. Knight points to an incident in 2007 in which Mr. Stamper became angry during a meeting regarding a complaint of discrimination by Mr. Knight, apparently with respect to overtime and acting sergeant assignments. The meeting involved Mr. Stamper and Will Kinne, who was acting Business Services Section director at the time. Mr. Stamper admits that he became angry and probably made a statement in the meeting about "playing the race card" because he was irritated that Mr. Knight continually accused him of discriminatory conduct.

1      3.  <u>Mr. Kenoyer</u>

2      Mr. Kenoyer, who is Caucasian, is a Supervisor II in FMD, where his primary

3  responsibility is managing King County's electronic building security systems and

4  supervising the security program and staff.  (Kenoyer Decl. ¶ 3.)  Mr. Kenoyer reported

5  to Mr. Stamper through October 2008; when Mr. Stamper retired, Mr. Kenoyer served as

6  acting security chief, reporting to Mr. Faquir and Ms. Brown.  (*Id.* ¶¶ 4-5.)

7      Mr. Knight points to four instances in which he claims that Mr. Kenoyer

8  discriminated against him on the basis of his race.  First, Mr. Knight testified that he had

9  heard that Mr. Kenoyer allowed Officer Martin, the Caucasian officer who was the

10 runner-up for Mr. Knight's sergeant position, to attend meetings at the YSC.  (2/18/2011

11 Knight Dep. 250-51.)  Second, Mr. Knight points to that Mr. Kenoyer's role in the

12 Lonnie Hampton incident.  (*See id.* at 291-92.)  Third, Mr. Knight testified about an

13 incident in which management did not follow up with him regarding the outcome of a

14 disciplinary issue he had reported.  (*See id.* at 246-49.)  Finally, Mr. Knight testified that

15 Mr. Kenoyer directed him to go to King County facilities Federal Way during his shift

16 rather than remain at the King County Courthouse.  (*See id.* at 257.)

17     Mr. Knight also alleges that Mr. Kenoyer discriminated against him by continuing

18 some of the practices initiated by Mr. Stamper.  Specifically, Mr. Knight points to the

19 practice of holding weekly sergeant's meetings at noon on Wednesdays rather than

20

21 (Stamper Dep. 22-23, 26-27, 46.)  In any event, Mr. Knight conceded in his brief and at oral
   argument that his claims of discriminatory treatment are based on his treatment as a sergeant and
22 not on conduct that occurred before his promotion.

during or close to Mr. Knight's shift. (*See* Stamper Dep. 13.) Mr. Knight also testified that Mr. Kenoyer did not give him an opportunity to provide input or participate in projects that were assigned at the sergeants' meetings. (*See* 2/18/11 Knight Dep. 238.) Specifically, Mr. Knight testified (1) that Mr. Kenoyer told him he could manage the testing of duress alarms at the King County Courthouse, but later decided to have two security officers manage the process during a weekend when Mr. Knight was not working (*id.* at 239-41); (2) that he was not told about a bomb threat at the YSC that had occurred during the day (*id.* at 242-43); and (3) that when he entered a sergeant's meeting he saw Mr. Kenoyer, Mr. Willard, and Mr. Kenoyer's "electrical protege" Mark Murphy discussing security alarms and access units, and that he was not involved in conducting the project (*id.* at 244).

Finally, Mr. Knight alleges in his response that Mr. Kenoyer had direct or indirect supervisory authority over Mr. Willard, knew of Mr. Knight's complaints, and failed to stop Mr. Willard's discriminatory conduct. (KC Resp. at 23 (citing Scully Decl. Ex. B ("Kenoyer Dep.") 4-6).) The cited pages of Mr. Kenoyer's deposition, however, show only that Mr. Kenoyer supervised Mr. Willard while he was acting chief. Mr. Knight has not directed the court to evidence that Mr. Kenoyer was aware that Mr. Knight thought Mr. Willard was racist.

    4. Mr. Faquir

Mr. Faquir, who is African-American, was Building Services Section Manager during the time period relevant to this motion. He has since been promoted to Deputy Director of FMD. (Brown Decl. ¶ 7.) Mr. Faquir was on the panel that recommended

1  Mr. Knight be promoted to sergeant; he also participated in the process of disciplining

2  Mr. Knight for the Data Unit/AFIS incident.  (*See generally* Faquir Decl.)

3      Mr. Knight testified that Mr. Faquir discriminated against him by forcing him to

4  share an office, desk, and computer with Mr. Willard and denying his requests for his

5  own office.  (2/18/11 Knight Dep. 281.)  Mr. Knight also argues in his brief that Mr.

6  Faquir discriminated against him on the basis of his race because he had supervisory

7  authority over Mr. Willard, knew of Mr. Knight's complaints, and did nothing to

8  intervene.  (KC Resp. at 23.)  Mr. Knight, however, points to no evidence that Mr. Faquir

9  was aware that Mr. Knight thought Mr. Willard's actions were racially motivated before

10  Mr. Knight reported the "sad day" comment.[9]  Finally, Mr. Knight alleges that Mr.

11  Faquir's involvement in his demotion constituted retaliation for filing the union grievance

12  and EEOC charge.

13      5.  Ms. Brown

14      Ms. Brown, who is Caucasian, is the director of FMD.  (Brown Decl. ¶ 2.)  She is

15  responsible for making hiring and firing decisions for FMD, in consultation with King

16  County's Human Resources Division and constrained by the King County Code, King

17  County's personnel guidelines, and the applicable collective bargaining agreements.  (*Id.*

18  ¶¶ 4, 17.)  As director of FMD, Ms. Brown approved Mr. Stamper and Mr. Faquir's

19  

20      [9] The evidence Mr. Knight cites in support of his assertion that Mr. Faquir knew of Mr.
Willard's discriminatory acts states only that Mr. Knight had complained to Mr. Faquir about

21  Mr. Willard correcting his officer reports and timesheets and countermanding his authority; had
asked to conduct scheduling, and had asked for his own office; the pages do not indicate that Mr.
Knight had complained to Mr. Faquir about discrimination. (*See* Knight Decl. ¶ 7; Scully Decl.

22  Ex. F ("Faquir Dep.") 29-32, 34-35; *see also* 2d Faquir Decl. (Dkt. # 76) ¶ 3.)

1   recommendation that Mr. Knight be promoted to sergeant, recommended Mr. Knight be

2   terminated, and ultimately determined that he should be demoted and suspended.  (*Id.* ¶¶

3   17-19, 23-24.)  Although she had some contact with Mr. Knight when he served on an

4   equal opportunity committee several years ago and when Mr. Knight reported

5   emergencies that had occurred during his shift, she has rarely interacted directly with Mr.

6   Knight.  (*Id.* ¶ 23; Brown Dep. 27.)

7          Mr. Knight contends that Ms. Brown discriminated against him on the basis of his

8   race because she had authority over Mr. Willard, knew of Mr. Knight's complaints, and

9   did nothing to intervene.  (KC Resp. at 23.)  Mr. Knight does not point to evidence that

10  Ms. Brown knew that Mr. Knight had concerns that Mr. Willard was discriminating

11  against him before March 2009.  Mr. Knight also contends that Ms. Brown's involvement

12  in his demotion constituted retaliation for his filing of the union grievance and EEOC

13  charge.  (*Id.*)

14                **II.     ANALYSIS:**

15  **A.     Summary Judgment Standard**

16         Summary judgment is appropriate if the pleadings, the discovery and disclosure

17  materials on file, and any affidavits, when viewed in the light most favorable to the non-

18  moving party, "show that there is no genuine dispute as to any material fact and the

19  movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex*

20  *Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los Angeles*, 477 F.3d

21  652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing there is

22  no genuine issue of material fact and that he or she is entitled to prevail as a matter of

law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.  *Cline v. Indus. Maint. Eng'g. & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000).  The non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial."  *Galen*, 477 F.3d at 658.  A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.  *Hernandez v. Spacelabs Medical Inc.*, 343 F.3d 1107, 1116 (9th Cir. 2003) (citing *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)).

**B.     Disparate Treatment**

Mr. Knight alleges claims for disparate treatment on the basis of race in violation of Title VII, 42 U.S.C. § 2000e-2(a), against King County, and disparate treatment in violation of 42 U.S.C. § 1981 against King County, Ms. Brown, Mr. Faquir, Mr. Stamper, Mr. Kenoyer, and Mr. Willard.[10]  "Analysis of an employment discrimination claim under § 1981 follows the same legal principles as those applicable in a Title VII disparate treatment case. . . .  Both require proof of discriminatory treatment and the same set of facts can give rise to both claims."  *Fonseca v. Sysco Food Servs. of Ariz.*, 374 F.3d 840, 850 (9th Cir. 2004).

When responding to a motion for summary judgment on claims under Title VII or § 1981, a plaintiff may proceed by using the burden-shifting framework of *McDonnell*

---

[10] Mr. Knight does not bring a claim for disparate treatment under the Washington Law Against Discrimination ("WLAD"), chapter 49.60 RCW.

*Douglas Corp. v. Green*, 411 U.S. 792 (1973), or by "simply produc[ing] direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the employer." *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007). Here, Mr. Knight has chosen to proceed under the *McDonnell Douglas* framework. (KC Resp. at 12; Willard Resp. at 6.) Under this analysis, a plaintiff must first establish a prima facie case of employment discrimination. *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007). If the plaintiff establishes a prima facie case, "the burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123-24 (9th Cir. 2000). If the defendant meets this burden, the plaintiff must then raise a triable issue of material fact as to whether the defendant's proffered reasons for its action are mere pretext for unlawful discrimination. *Noyes*, 488 F.3d at 1168.

1. Ms. Brown, Mr. Faquir, Mr. Stamper, and Mr. Kenoyer

The court first addresses Mr. Knight's disparate treatment claim against Ms. Brown, Mr. Faquir, Mr. Stamper, and Mr. Kenoyer, the senior managers at FMD.

a. *Prima Facie Case*

A plaintiff may establish a prima facie case of disparate treatment by showing (1) that he is a member of a protected class; (2) that he was qualified for his position and performing his job satisfactorily; (3) that he experienced an adverse employment action; and (4) that "similarly situated individuals outside [his] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to

an inference of discrimination." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). The first two elements of the prima facie case are not at issue here. The parties, however, are in dispute regarding whether Mr. Knight can establish the third and fourth elements of the prima facie case.

            i.       Adverse Employment Action

"An adverse employment action is one that 'materially affect[s] the compensation, terms, conditions, or privileges of . . . employment.'" *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (quoting *Chuang*, 225 F.3d at 1126). The Ninth Circuit has recognized that only "non-trivial" employment actions, such as "termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion" qualify as adverse employment actions. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). "[A]ssigning more, or more burdensome, work responsibilities is an adverse employment action." *Davis*, 520 F.3d at 1089, 1090. Transfers of job duties and undeserved low performance evaluations may also constitute adverse employment actions. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). The relocation of one's working space may constitute an adverse employment action where it materially affects the terms, conditions, or privileges of employment. *See Chuang*, 225 F.3d at 1125-26.

Mr. Knight does not point to a specific adverse employment action that he attributes to racial discrimination; notably, he does not contend that this demotion and suspension constituted adverse employment actions in the context of his disparate treatment claims. (*See* KC Resp. at 13.) Rather, Mr. Knight argues that he suffered an

adverse employment action because he was "denied opportunities to exercise the full responsibilities of his position" through a series of actions by Defendants.  (*Id.*)  Mr. Knight cites the following as evidence of adverse employment actions:  (1) Mr. Kenoyer denied him the opportunity to provide input in sergeants' meetings (2/18/11 Knight Dep. 238); (2) Mr. Kenoyer assigned security officers to test the duress alarms (*id.* at 239-41); (3) Mr. Kenoyer and Mr. Faquir did not follow up with him after he reported a disciplinary issue (*id.* at 246-49); (5) Mr. Kenoyer met with Officer Martin regarding security at the YSC (*id.* at 250-51); (6) Mr. Kenoyer told Mr. Knight to go to Federal Way during his shift (*id.* at 257); (7) revisions to the master schedule made Mr. Knight's shift start an hour earlier (*id.* at 323); (8) Mr. Stamper and later Mr. Kenoyer conducted the weekly sergeants' meeting at noon on Wednesdays (Stamper Dep. 13); (9) Mr. Stamper promoted Officer Martin to acting sergeant (*id.* at 39-40); (10) Mr. Stamper, Mr. Kenoyer, and Mr. Willard met informally or "grab[bed] a cup of coffee" outside of Mr. Knight's presence (*id.* at 50; Willard Dep. 44-46); and (11) only Mr. Willard was allowed to serve as acting chief (Stamper Dep. 63.)  Elsewhere in his response, Mr. Knight attributes acts such as Mr. Kenoyer's disapproval of his memorandum to Officer Hampton, being denied overtime pay, and being forced to share an office with the other two sergeants to discriminatory motives.  Mr. Knight does not list in his response any incidents of adverse employment actions involving Ms. Brown or Mr. Faquir.

As a threshold matter, the court finds that a number of the incidents that Mr. Knight lists are not "adverse employment actions" within the meaning of Title VII because Mr. Knight has not shown how they "materially affect[ed] the compensation,

1  terms, conditions, or privileges of employment." *Davis*, 520 F.3d at 1089.  For example,

2  Mr. Knight's allegations that Mr. Kenoyer directed him to go to a King County facility in

3  Federal Way during his work hours,[11] that Mr. Kenoyer had security officers conduct

4  duress alarm testing over a weekend when Mr. Knight was not on duty, and that

5  managers did not follow up with him about a disciplinary report are not adverse

6  employment actions within the meaning of Title VII.  In addition, Mr. Knight does not

7  explain how Officer Martin's appointment as acting sergeant after Mr. Knight had

8  already been promoted to sergeant affected Mr. Knight's compensation, terms,

9  conditions, or privileges of employment.  Although Mr. Knight may have felt slighted by

10  these actions, none can be said to have materially affected his compensation or the terms,

11  conditions, or privileges of his employment.  *See, e.g., Chuang*, 225 F.3d at 1126

12  (university's failure to inform plaintiffs of the results of an investigation did not

13  materially affect the compensation, terms, conditions, or privileges of plaintiffs' of

14  employment).

15  　　　With respect to Mr. Knight's allegations regarding the shared office space, it is

16  undisputed that all three sergeants shared a single office space, and all three sergeants

17  complained about the shared office to no avail.  Mr. Knight's reliance on *Chuang* for his

18  contention that the shared office constituted an adverse employment action is, therefore,

19  misplaced.  In *Chuang*, the relocation of plaintiffs' laboratory was an adverse

20  

21  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

　　　[11] In any event, Mr. Kenoyer explains that he sent Mr. Knight to Federal Way to work
with the custodial staff at Seattle-King County Public Health Clinic because the staff repeatedly

22  tripped security alarms at night.  (2d Kenoyer Decl. ¶ 3.)  Mr. Kenoyer asked Mr. Knight to
come up with a solution to prevent the false alarms from occurring. (*Id.*)

employment action where it disrupted important, ongoing research projects, resulting in delay, loss of experimental subjects, denial of research grants, and damage to fragile, expensive research equipment. *Chuang*, 225 F.3d at 1125-26. Here, by contrast, Mr. Knight has not explained how the shared office materially affected the terms or conditions of his employment.

The court agrees, however, viewing the evidence in the light most favorable to Mr. Knight, that Mr. Knight's testimony that he was denied an opportunity to provide input at meetings; that Mr. Stamper, Mr. Kenoyer, and Mr. Willard met outside his presence; that adjustments to the master calendar changed his shift in ways that inconvenienced him; that he was not offered an opportunity to serve as acting chief; and that he was denied overtime constitutes evidence of actions that materially affected the terms, conditions, or privileges of employment.

ii.     Similarly Situated Individuals / Other Circumstances

Under the fourth prong of the *McDonnell Douglas* prima facie case, the plaintiff must show either that "similarly situated individuals outside [his] protected class were treated more favorably, or [that] other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson*, 358 F.3d at 603. "Whether two employees are similarly situated is ordinarily a question of fact." *Beck v. United Food & Commercial Workers Union Local 99,* 506 F.3d 874, 885 n. 5 (9th Cir. 2007). In general, "individuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. County of Los Angeles,* 349 F.3d 634, 641 (9th Cir. 2003). The employees' roles need not be identical, but they must be similar "in

1   all material respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006); *see also*

2   *Aragon v. Republic Silver State Disposal, Inc.,* 292 F.3d 654, 660 (9th Cir. 2002).

3        Mr. Knight argues that Mr. Willard was a similarly situated employee who was

4   more favorably treated by more senior management "by inclusion in management

5   decisions, meetings, and access to the full opportunities afforded to a sergeant." (KC

6   Resp. at 14.)  The court concludes, however, that Mr. Willard was not similarly situated

7   to Mr. Knight "in all material respects" in the context of Mr. Knight's allegations of

8   disparate treatment by the King County Defendants.  *See Moran*, 447 F.3d at 755.  First,

9   Mr. Willard was the most senior of the three security sergeants, and Mr. Knight was the

10  most junior.  As the most senior sergeant, Mr. Willard had certain privileges under the

11  CBA, including first choice of shift and work assignments, such as the opportunity to

12  serve as acting chief.  Mr. Knight, by contrast, was the last of three sergeants to enjoy

13  those privileges.  Second, Mr. Willard worked the day shift, while Mr. Knight worked

14  during the night when the courthouse was closed.  Because Mr. Willard worked the same

15  hours as the FMD managers, he had opportunities for informal contact with management

16  and other staff that Mr. Knight did not have.  Thus, because Mr. Willard was the senior

17  sergeant and worked the day shift, his role was materially different in two important

18  respects from Mr. Knight's, and therefore was not similarly situated to Mr. Knight with

19  respect to Mr. Knight's allegations regarding exclusion from informal meetings.[12]

20

21      _____

22      [12] Although Sergeant Meyer is Caucasian, Mr. Knight does not point to him as a similarly
    situated individual.  To the contrary, Mr. Knight contends that Sergeant Meyer is not similarly
    situated because he was based at the RJC and not at the downtown courthouse.  (*See* Willard

1     Mr. Knight has not presented evidence supporting a conclusion that he was treated

2     worse than similarly situated Caucasian employees with respect to his other allegations of

3     disparate treatment by the King County Defendants.  Mr. Knight testified that he had no

4     idea how his overtime pay compared to any other sergeant or officer.  (*See* 2/18/11

5     Knight Dep. 307.)  In addition, the evidence is undisputed that all three sergeants shared

6     the same office, desk, and computer; thus, if Mr. Willard took the only desk key home

7     with him, both Mr. Knight and Sergeant Meyer would have been locked out of the shared

8     desk.  With respect to scheduling authority, Mr. Knight does not point to any evidence

9     that Sergeant Meyer was allowed to assign shifts in the master schedule.  Mr. Knight also

10    does not point to any evidence regarding Sergeant Meyer's input in weekly sergeants'

11    meetings, that Sergeant Meyer was allowed to serve as acting chief, or that Mr. Kenoyer

12    treated the disciplinary decisions of Caucasian sergeants differently.  Finally, Mr. Knight

13    testified that the changes to shift times in the master calendar "constituted discrimination

14    to everybody."  (2/18/2011 Knight Dep. 323-34.)  For these reasons, the court concludes

15    that Mr. Knight has not met his burden to establish that the King County Defendants

16    treated similarly situated sergeants outside of his protected class more favorably.  The

17    court concludes, therefore, that Mr. Knight has not met his burden to establish a prima

18

19    Resp. at 8.)  Sergeant Meyer appears, however, to be a more apt comparator in material respects
20    because he, like Mr. Knight, was junior to Mr. Willard and did not work the day shift at the King
      County Courthouse, and thus, like Mr. Knight, did not have the same access to opportunities and
21    to informal contact with management that Mr. Willard enjoyed.  *See Moran*, 447 F.3d at 756
      n.14 (observing that another group of African-American baseball players would have been
22    similarly situated to plaintiffs, and that plaintiffs' Title VII claim failed because it rested on a
      comparison to players whose situation differed from plaintiffs' in two material respects).

facie case of disparate treatment by Ms. Brown, Mr. Faquir, Mr. Stamper, or Mr. Kenoyer.

### b. Legitimate nondiscriminatory reason

If a plaintiff produces evidence sufficient to establish a prima facie case under *McDonnell Douglas,* "[t]he burden of production, but not persuasion, . . . shifts to [the defendant] to articulate some legitimate, nondiscriminatory reason for the challenged action." *Chuang*, 225 F.3d at 1123-24. Although the court concludes above that Mr. Knight did not satisfy his initial burden to demonstrate a prima facie case of disparate treatment by Ms. Brown, Mr. Faquir, Mr. Stamper, or Mr. Kenoyer, the court nevertheless briefly addresses these defendants' legitimate nondiscriminatory reasons for their actions.

First, Mr. Kenoyer explains that the weekly sergeant's meeting was scheduled at noon for budgetary reasons. By scheduling the meeting at noon, King County needed to pay only one employee, Mr. Knight for working overtime, and did not need to pay overtime to the other attendees. (Kenoyer Decl. ¶ 13; 2d Kenoyer Decl. (Dkt. # 77) ¶ 6.) Mr. Kenoyer and Mr. Stamper explain that the reason Mr. Willard, Mr. Stamper, and Mr. Kenoyer could meet informally or "grab a cup of coffee" was because they all worked the day shift. As a night-shift worker whose hours did not overlap with those of Mr. Stamper or Mr. Kenoyer, Mr. Knight did not have this opportunity. (*See* Stamper Dep. 50; Kenoyer Decl. ¶ 13.)

Second, with respect to the denial of overtime, Mr. Faquir states that he required that all overtime be preapproved, and that he was responsible for authorizing overtime

requests.  (Faquir Decl. ¶ 32.)  Judy Hairston, FMD Secretary, reviewed the sergeants' overtime requests and found that Mr. Knight received more than twice as many hours of overtime as his fellow sergeants.  (Hairston Decl. ¶¶ 2-3.)

Third, with respect to scheduling, Mr. Willard was the sole sergeant responsible for scheduling before Mr. Knight became a sergeant, and continued to manage the master schedule afterward.  Thus, no scheduling responsibilities were "taken away" from Mr. Knight.  (2d Kenoyer Decl. ¶ 7; *see* 3/7/2011 Knight Dep. 342-43.)

Fourth, with respect to acting chief assignments, Mr. Stamper testified that Mr. Willard "might have filled in one day or something" because Mr. Willard was the senior sergeant, while Mr. Knight would not have had that opportunity because he was the most junior of the three sergeants.  (Stamper Dep. 63.)

Fifth, with respect to input at meetings and exclusion from projects, Mr. Kenoyer explains that the project Mr. Knight testified about (2/18/11 Knight Dep. 244) was a large-scale electrical project, and that he assigned electrician Mark Murphy, who is African-American, to the project based on his electrical expertise and experience.  (2d Kenoyer Decl. ¶ 2.)  Mr. Kenoyer explains that he did not exclude Mr. Knight from the project on the basis of his race, and that Mr. Knight was assigned other significant projects.  (*Id.* ¶¶ 2, 10.)

Finally, with respect to Mr. Kenoyer reprimanding Mr. Knight about his memo memo to Officer Hampton, Mr. Kenoyer explained (1) that security sergeants are not allowed to unilaterally discipline security officers because they are part of the same bargaining unit; (2) that he reviewed the security camera records and concluded that Mr.

Knight's allegations were unfounded; and (3) although Mr. Knight was told to use the chain of command for discipline, he was not reprimanded for writing the memo. (*See* Kenoyer Decl. ¶¶ 20-23.)

### c. Pretext

Under the *McDonnell Douglas* framework, the plaintiff bears the ultimate burden of showing defendant's stated reasons to be merely pretextual, once defendant has given legitimate, nondiscriminatory grounds for its actions. *McDonnell Douglas*, 411 U.S. at 802-04. A plaintiff may defeat summary judgment by offering direct or circumstantial evidence "that a discriminatory reason more likely motivated the employer," or "that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable." *Anthoine v. North Central Counties Consortium*, 605 F.3d 740, 753 (9th Cir. 2010) (quoting *Chuang*, 225 F.3d at 1127). Direct evidence includes "clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan v. Am. Seafoods Co.,* 413 F.3d 1090, 1095 (9th Cir. 2005). Only a small amount of direct evidence is necessary in order to create a genuine issue of material fact as to pretext. *Id.* By contrast, circumstantial evidence is evidence "that tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998). "Circumstantial evidence of pretext must be specific and substantial in order to survive summary judgment." *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001). Merely

1  denying the credibility of the employer's proffered reasons is insufficient to withstand

2  summary judgment.  *Lindsey v. Shalmy,* 29 F.3d 1382, 1385 (9th Cir. 1994).

3       Mr. Knight does not address the issue of pretext in his response to the King

4  County Defendants' motion for summary judgment on his disparate treatment claims.

5  (*See* Resp. (Dkt. # 68) at 13-14.)  In response to the court's questions at oral argument,

6  Mr. Knight's counsel relied on Mr. Willard's "sad day" comment as evidence that the

7  actions of Ms. Brown, Mr. Faquir, Mr. Stamper, and Mr. Kenoyer were motivated by

8  discriminatory reasons or that their explanations for their actions are inconsistent or

9  otherwise unbelievable.  Mr. Knight does not explain how Mr. Willard's January 2008

10  "sad day" comment, which was not disclosed to Mr. Knight or any of the King County

11  Defendants until March 2009, constitutes "specific and substantial" evidence of

12  discriminatory intent, inconsistency, or lack of credibility on the part of any defendant

13  other than Mr. Willard.  *See Anthoine*, 605 F.3d at 753; *Bergene*, 272 F.3d at 1142.  Thus,

14  even if Mr. Knight had met his initial burden to establish a prima facie case of disparate

15  treatment, he has not met his burden under Step 3 of the *McDonnell Douglas* framework

16  to show that the King County Defendants' reasons for their actions were pretextual.

17       The court concludes, therefore, that Mr. Knight has not met his burden under the

18  *McDonnell Douglas* framework to demonstrate that there exists a genuine dispute of

19  material fact that Ms. Brown, Mr. Faquir, Mr. Stamper, or Mr. Kenoyer subjected him to

20  disparate treatment on the basis of race in violation of Title VII and § 1981.  Accordingly,

21  the court grants the Ms. Brown, Mr. Faquir, Mr. Stamper, and Mr. Kenoyer's motion for

22  summary judgment on these claims.

2. Mr. Willard

The court turns now to Mr. Knight's claim that Mr. Willard subjected him to disparate treatment on the basis of race in violation of Title VII and § 1981.

a. *Prima Facie Case*

Mr. Knight alleges that Mr. Willard subjected him to an adverse employment action by (1) taking away authority for timesheets (Willard Dep. 46-48); (2) refusing to allow Mr. Knight to schedule officers (Willard Dep. 20-21); (3) depriving Mr. Knight of a viable workspace by taking home the key to a drawer in the sergeants' shared desk (Willard Dep. 46; Knight Decl. ¶ 6); and (4) making the "sad day" comment. (*See* Willard Resp. at 7-8.)

The court concludes, viewing the evidence in the light most favorable to Mr. Knight, that only Mr. Willard's assumption of Mr. Knight's authority for timesheets rises to an adverse employment action within the meaning of Title VII. Mr. Knight was responsible for managing timesheets for the officers on his shift, but Mr. Willard assumed responsibility for managing the timesheets for two officers. A jury could reasonably conclude that this action "materially affected" the terms, conditions, or privileges of Mr. Knight's employment as a security sergeant. Mr. Knight's three remaining allegations, however, are not sufficient to establish an adverse employment action. First, Mr. Knight has not shown that Mr. Willard's retention of scheduling responsibilities that he already possessed before Mr. Knight became a sergeant affected Mr. Knight's terms, conditions, or privileges of employment. Second, Mr. Knight does not explain how a comment that he did not hear and was not aware of materially affected

1 the terms or conditions of his employment.   Finally, the evidence Mr. Knight cites in

2 support of his contention that Mr. Willard denied him his workspace states only that Mr.

3 Willard took the shared key home with him on occasion.  An occasional lack of access to

4 a desk drawer cannot be said to "materially affect" the compensation, terms, conditions,

5 or privileges of employment.  Further, as discussed above, Sergeant Meyer was also

6 affected when Mr. Willard took the key home with him.  *See Davis*, 520 F.3d at 1089.

7       With respect to the fourth prong of his prima facie case against Mr. Willard, Mr.

8 Knight relies on the circumstances surrounding the adverse employment action rather

9 than a comparison to a similarly situated Caucasian individual.  *See Peterson*, 358 F.3d at

10 603.  Specifically, Mr. Knight argues that because Mr. Willard made the "sad day"

11 comment when Mr. Knight was promoted, it is reasonable to infer that any adverse

12 employment actions taken by Mr. Willard were taken on account of Mr. Knight's race.

13 The court agrees.  Accordingly, the court concludes that Mr. Knight has met his burden to

14 establish a prima facie case of disparate treatment by Mr. Willard.  Because the evidence

15 supports a finding that Mr. Willard supervised Mr. Knight,[13] at least during his

16 probationary period, Mr. Knight has also met his burden to establish a prima facie case of

17 disparate treatment against King County.

---

18

19     [13] Under Title VII, "[a]n employer is vicariously liable for actions by a supervisor who has 'immediate (or successively higher) authority over the employee.'"  *Dawson*, 630 F.3d at 940 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)).  "This distinction 'is not

20 dependent upon job titles or formal structures within the workplace, but rather upon whether a supervisor has the authority to demand obedience from an employee.'"  *Id.* (quoting *McGinest*, 360 F.3d at 1119 n.13).  At oral argument, Mr. Willard's counsel and the King County

21 Defendants' counsel conceded that, in light of the evidence that Mr. Willard was responsible for training Mr. Knight during his probationary period (*see* Knight Decl. ¶ 6), a genuine dispute of

22 material fact exists regarding whether Mr. Willard was Mr. Knight's supervisor.

### b. Legitimate Nondiscriminatory Reason

Because Mr. Knight has met his burden to establish a prima facie case of disparate treatment against Mr. Willard, the burden shifts to Mr. Willard to offer a legitimate nondiscriminatory reason for removing Mr. Knight's responsibility for managing the officers' timesheets. *Chuang*, 225 F.3d at 1123-24. Mr. Willard explains that the officers—both of whom are African-American—were unhappy with how Mr. Knight processed their time sheets, and that he assumed responsibility for the officers' timesheets to improve morale. (Willard Dep. 46-48.) In support of this contention, Mr. Willard offers the declaration of one of the officers, Ted Griffin, who states that he asked Mr. Willard to take over management of his time sheets because Mr. Knight repeatedly made errors on his time sheets and took too long to approve them. (Griffin Decl. (Dkt. # 82) ¶¶ 2-5.) Because the burden at step two of the *McDonnell Douglas* framework is one of production, and not persuasion, the court concludes that Mr. Willard has satisfied his burden to produce a legitimate nondiscriminatory reason for his action.

### c. Pretext

As explained above, a plaintiff may defeat summary judgment by offering direct or circumstantial evidence that a discriminatory reason more likely motivated the employer. *Anthoine*, 605 F.3d at 753. Direct evidence includes clearly racist statements or actions by the employer, and only a small amount of direct evidence is necessary to defeat summary judgment. *Coghlan,* 413 F.3d at 1095.

Here, Mr. Knight argues that Mr. Willard's "sad day" comment is direct evidence of Mr. Willard's discriminatory animus. (Willard Resp. at 8.) The court agrees. The

ORDER- 35

court therefore denies Mr. Willard's motion for summary judgment with respect to Mr. Knight's § 1981 disparate treatment claim.  In addition, because, viewing the facts in the light most favorable to Mr. Knight, Mr. Willard was Mr. Knight's supervisor, at least during his probationary period, the court denies King County's motion for summary judgment on Mr. Knight's Title VII and § 1981 disparate treatment claims to the extent they are premised on vicarious liability for Mr. Willard's discriminatory actions.

**C.  Hostile Work Environment Claims**

Mr. Knight alleges a claim for hostile work environment in violation of Title VII against King County and claims for hostile work environment in violation of § 1981 and the Washington Law Against Discrimination ("WLAD"), ch. 49.60 RCW, against King County, Ms. Brown, Mr. Faquir, Mr. Stamper, Mr. Kenoyer, and Mr. Willard.

To prevail on a hostile workplace claim premised on race, a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a racial nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment.  *Vasquez*, 349 F.3d at 642.  To determine whether conduct was sufficiently severe or pervasive to violate Title VII, courts look at all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  In addition, "[t]he working environment must both subjectively and objectively be perceived as abusive." *Vasquez*, 349 F.3d at 642 (quoting *Brooks*, 229

F.3d at 923). Conduct that is not severe or pervasive enough to create an objectively

hostile or abusive work environment is beyond Title VII's purview. *Harris,* 510 U.S. at

21-22. A § 1981 hostile work environment claim has the same elements as a claim under

Title VII. *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1122 n.3 (9th Cir. 2008).

Similarly, a hostile work environment claim under the WLAD has substantially the same

elements as a claim under Title VII. *See Davis v. W. One Auto Group*, 166 P.3d 807, 811

(Wash. Ct. App. 2007).

There is no dispute that Mr. Knight found Defendants' conduct unwelcome. The

parties dispute, however, whether Mr. Knight can satisfy the first and third elements of

the prima facie case in light of Mr. Knight's testimony that no one at King County ever

made a racial comment to him or in his presence. (2/18/2011 Knight Dep. 206.)

Mr. Knight relies primarily on *Raniola v. Bratton*, 243 F.3d 610, 621 (2d Cir.

2001). In *Raniola*, a female police officer's supervisor repeatedly made overt sex-based

comments to the officer; the officer saw a sexual slur written over her name in an official

police ledger; and her name and sexually offensive language appeared next to her name

and the name of the other female officer in the precinct on a poster advertising a police

event. *Id.* at 618. In addition, the two female officers were given exceptionally

demanding workloads and assigned work that was normally assigned to much less senior

officers. *Id.* at 619. The Second Circuit held that, by virtue of the open sex-based

comments made by the female officer's supervisor and co-workers, a reasonable jury

could infer that the other abuse Ms. Raniola suffered was also on account of sex. *Id.* at

621; *see also Davis*, 166 P.3d at 809, 812 (inference that acts of supervisor were racially

1  motivated was appropriate where plaintiff's supervisor made multiple racially charged

2  comments in plaintiff's presence).

3      Mr. Knight contends that Mr. Willard's "sad day" statement is akin to the open

4  sex-based comments in *Raniola*, and that, as a result, a jury can infer that other negative

5  events Mr. Knight experienced were on account of race. Mr. Knight lists the following

6  conduct as harassing and race-based: (1) Mr. Willard took over the management of

7  schedule and timesheets for the security officers; (2) Mr. Willard "countermanded" Mr.

8  Knight's attempts to correct and/or discipline officer misbehavior; (3) Mr. Stamper, Mr.

9  Kenoyer, and Mr. Willard excluded Mr. Knight from meetings; (4) Mr. Kenoyer once

10 directed Mr. Knight to travel to King County facilities in Federal Way during his shift;

11 and (5) Mr. Willard on occasion, locked Mr. Knight out of the sergeants' shared desk.[14]

12 (KC Resp. at 17-19; Willard Resp. at 11.)

13      The court concludes, viewing the evidence in the light most favorable to Mr.

14 Knight, that Mr. Knight has not presented evidence sufficient to satisfy the elements of a

15 prima facie case of hostile work environment against any of the Defendants. First, the

16 sole alleged incident of "verbal or physical conduct of a racial nature" is Mr. Willard's

17 "sad day" comment, which Mr. Knight did not hear and did not know about until a year

18 after the comment was made. Mr. Knight's case is thus unlike *Raniola*, in which

19 comments and insults of an overtly sexual nature had been made in the plaintiff's

20

21      [14] As discussed above, Mr. Knight's allegations that Mr. Knight was forced to share an email address with Mr. Willard, that Mr. Willard reported that Mr. Knight had left work early, and that Mr. Knight was not paid for approved overtime are not supported by the cited evidence.

22 (*See supra* n.5 & n.6.)

presence on multiple occasions, giving rise to an inference that other abusive conduct was sexually-based. *Raniola*, 243 F.3d at 621; *see also Davis*, 166 P.3d at 812.[15] Second, under the *Harris* factors of frequency, severity, degree of threat or humiliation, and interference with work performance, the cited conduct was not objectively abusive such that it would alter the conditions of Mr. Knight's employment. *Harris*, 510 U.S. at 23. The court notes that the Ninth Circuit has affirmed grants of summary judgment to defendants where the plaintiffs were subjected to conduct that was much more overtly racially related, severe, and pervasive than the conduct alleged here. *See Vasquez*, 349 F.3d at 643 (comparing cases); *Manatt v. Bank of Am., NA*, 339 F.3d 792, 799 (9th Cir. 2003) (same). Because Mr. Knight has not met his burden to establish a prima facie case that he was subjected to verbal or physical conduct of a racial nature that was severe or pervasive enough to create an objectively hostile or abusive work environment, the court grants Defendants' motions for summary judgment on Mr. Knight's hostile work environment claims.

**D. Retaliation Claims**

Mr. Knight alleges a claim for retaliation in violation of Title VII against King County. Mr. Knight also alleges claims for retaliation in violation of § 1981 and the WLAD against King County, Ms. Brown, and Mr. Faquir (collectively, for purposes of the court's discussion of retaliation, "King County").

---

[15] At oral argument, Mr. Knight's counsel conceded that he was not aware of any cases finding a hostile work environment where no racial or sexual comments were made in the plaintiff's presence.

Title VII prohibits employers from discriminating against an employee because that employee "has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a). Courts apply the three-step *McDonnell Douglas* burden-shifting analysis to retaliation claims.  *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1088-89 (9th Cir. 2008).  Under this analysis, the employee must first establish a prima facie case of retaliation.  *Id.* at 1089. If he or she does so, the employer must articulate a legitimate, nonretaliatory reason for the challenged action.  *Id.*  If the employer satisfies this burden, the employee must show that the proffered reason is merely a pretext for retaliation.  *Id.*  In the Ninth Circuit, the Title VII framework is used when analyzing a retaliation claim under § 1981.  *Manatt*, 339 F.3d at 800-01.  Similarly, Washington courts rely on federal decisions interpreting Title VII to decide issues under WLAD.  *See Glasgow v. Georgia-Pacific Corp.*, 693 P.2d 708, 711 n.2 (Wash. 1985).

1. Prima Facie Case

"To make out a prima facie case of retaliation, an employee must show that (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action."  *Davis*, 520 F.3d at 1093-94.

Mr. Knight has met his burden to establish the first two elements.  Mr. Knight engaged in protected activities when he complained about racial discrimination to his supervisors, submitted a grievance to his union, and filed an EEOC charge.  *See Ray v.*

*Henderson*, 217 F.3d 1234, 1241 n.3 (9th Cir. 2000). Mr. Knight was subjected to an adverse employment action when he was demoted from sergeant to dispatcher and suspended for 20 days. *See id.* at 1243 (holding that an action is cognizable as an adverse employment action in the context of a retaliation claim if it is reasonably likely to deter employees from engaging in protected activity).

The element of causation presents a closer question. The Ninth Circuit has recognized that in some cases "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air., Inc.*, 281 F.3d 1054, 1064-65 (9th Cir. 2002). Nevertheless, "timing alone will not show causation in all cases[.]" *Id.* at 1065. Instead, a plaintiff must show that the adverse employment action "occurred fairly soon after the employee's protected expression." *Id.* (quoting *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009-10 (7th Cir. 2000)); *see also Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

Here, the proximity in time between Mr. Knight's complaints and King County's adverse employment actions presents sufficient evidence that a jury could infer causation. As discussed above, the timeline in this case is as follows: (1) The King County Sheriff's Office initiated an investigation of Mr. Knight by October 20, 2008. (2) Shortly therafter, the Sheriff's Office reported the Data Unit/AFIS incident to FMD. (3) On October 29, 2008, Mr. Knight filed his union grievance alleging disparate treatment. (4) In January 2009, Ms. Eakes presented her report finding Mr. Knight's actions had violated the King County Code and FMD policies. (5) In early March 2009, Mr. Knight reported Mr. Willard's "sad day" comment to Mr. Faquir. Defendants hired outside investigator Ms.

Dolliver to investigate the "sad day" comment and Mr. Knight's union grievance. (6) On March 3, 2009, Ms. Brown and Mr. Faquir proposed Mr. Knight's termination. (7) On March 24, 2009, Mr. Faquir conducted Mr. Knight's *Loudermill* hearing. (8) On May 19, 2009, FMD concluded that Mr. Willard had made the "sad day" comment, and proposed Mr. Willard's demotion and suspension. (9) On May 22, 2009, Mr. Knight filed his EEOC charge. (10) On May 25, 2009, Mr. Willard retired rather than accept discipline. (11) On June 5, 2009, Mr. Faquir informed Mr. Knight that he would not be terminated, but rather would be demoted and suspended. Because this timeline demonstrates that an adverse employment action occurred "fairly soon" after a protected activity, *Villairimo*, 281 F.3d at 1064-65, the court concludes that Mr. Knight has met his burden to establish causation and a prima facie case of retaliation.

2. <u>Legitimate, Nonretaliatory Reason</u>

Next, the burden shifts to King County to produce evidence that it demoted and suspended Mr. Knight for a legitimate, nonretaliatory reason. *Davis*, 520 F.3d at 1094. King County has met this burden by presenting evidence to support its stated reason for demoting and suspending Mr. Knight: namely, that Mr. Knight's entry into the Data Unit and AFIS Unit and requests for information to assist Seattle Bonding violated the King County Code and King County's Code of Ethics. (*See generally* Brown Decl.; Faquir Decl.) Ms. Brown explains that the punishment was severe because Mr. Knight's conduct seriously undermined the critical working relationship between the King County Sheriff's Office and FMD. (Brown Decl. ¶ 18.) Further, Ms. Brown has offered King County's Personnel Guidelines, which set forth the procedure for disciplining career

service employees, the causes for which a career service employee may be disciplined, and the types of disciplinary actions available. (Brown Decl. Ex. B.) King County's Personnel Guidelines do not require progressive discipline before terminating, suspending, or demoting a career service employee. (*Id.; see also* 2d Faquir Decl. ¶ 7 & Ex. B.) The court concludes that King County has met its burden to produce a legitimate, nonretaliatory reason for Mr. Knight's demotion and suspension.

### 3. Pretext

Finally, the burden returns to Mr. Knight to show that King County's proffered reason for his demotion and suspension was a pretext for retaliation. *Davis*, 520 F.3d at 1094. "The plaintiff may show pretext either (1) by showing that unlawful discrimination more likely motivated the employer, or (2) by showing that the employer's proferred explanation is unworthy of credence because it is inconsistent or otherwise not believable." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005). "An employer may be held liable under Title VII even if it had a legitimate reason for its employment decision, as long as an illegitimate reason was a motivating factor in the decision." *Id.* at 1040. "Circumstantial evidence of pretext must be specific and substantial in order to survive summary judgment." *Bergene*, 272 F.3d at 1142. Merely denying the credibility of the employer's proffered reasons is insufficient to withstand summary judgment. *Lindsey,* 29 F.3d at 1385. The court concludes that Mr. Knight has not met his burden to demonstrate that King County's reasons for his demotion and suspension were pretext for retaliation.

Mr. Knight contends, first, that the temporal proximity between his protected activity and his demotion and suspension, alone, is sufficient evidence that the King County Defendants' reason for their action was pretextual. (KC Resp. at 15.) Mr. Knight relies on *Dawson v. Entek Intern.*, 630 F.3d 928, 936 (9th Cir. 2011). In *Dawson*, the plaintiff called in sick, but did not follow the employer's procedure for taking a one-day unscheduled absence. *Id.* at 933. The next day, he told a person in human resources that he wanted to file a complaint because his supervisor and coworkers had been calling him names based on his sexual orientation. *Id.* Two days after that, the employer fired the plaintiff, ostensibly for not following the proper procedure to report his day off. *Id.* at 933-34. The Ninth Circuit held that "the gravity of Dawson's complaints coupled with the time frame are such that a reasonable trier of fact could find in favor of Dawson on his retaliation claim." *Id.* at 937. *See also Bell v. Clackamas Cnty.*, 341 F.3d 858, 862-864, 866 (9th Cir. 2003) (temporal proximity sufficient where plaintiff had positive training scores prior to complaint of racial harassment, but poor reviews, suspension, and termination closely followed plaintiff's complaint). Mr. Knight points out that his EEOC charge immediately preceded the decision to suspend and demote him. (KC Resp. at 15 (citing Knight Decl., Attachs. A, B at 3).) Mr. Knight, however, filed his May 2009 EEOC charge after Ms. Brown and Mr. Faquir had already proposed his termination, and, Ms. Brown and Mr. Faquir decided to impose *less* severe discipline after he filed the charge. The court therefore concludes that temporal proximity, alone, does not permit an inference of pretext in this case.

Second, Mr. Knight argues that King County's proffered explanation is "incredible" because the punishment he received was more severe than was justified for "walking into a Sheriff's Office unit and asking questions to try and straighten out whether a person in jail in California should be held in custody and extradited to Washington because the felon had a warrant in a different name," particularly in light of his previous good record.   (KC Resp. at 15-16; *see id.* at 9-11.)  Mr. Knight has not, however, offered evidence, aside from his own speculation, that he was subjected to disproportionately severe discipline in light of his violations of the King County Code of Ethics and the FMD Security Policy and Procedures.  As the Ninth Circuit has made clear, "merely denying the credibility of the employer's proffered reasons is insufficient to withstand summary judgment."  *Lindsey,* 29 F.3d at 1385.

Finally, Mr. Knight suggests that King County's reason for his demotion and suspension is pretextual because "Defendants considered Knight's grievance and EEOC charge at the same time as they considered how to discipline Knight for his entry into the Data/AFIS unit, discussing both matters during meetings." (KC Resp. at 14 (citing Brown Dep. 70:7-10).)  Mr. Knight, however, mischaracterizes Ms. Brown's testimony.  Ms. Brown testified that Ms. Whitfield, King County's human resources director, reminded the group of managers who were considering Mr. Knight's discipline that Mr. Knight's grievance and any potential discipline were two separate issues, and that the "purpose [of the meetings] was to discuss the discipline and not the grievance."  (Brown Dep. 70:7-21.)

Because Mr. Knight has not met his burden under the *McDonnell Douglas* framework to demonstrate that he was demoted and suspended in retaliation for filing his 2008 union grievance and 2009 EEOC charge, the court grants King County, Ms. Brown, and Mr. Faquir's motion for summary judgment on Mr. Knight's claims for retaliation under Title VII, § 1981, and the WLAD.

**E.      § 1983 Unlawful Employment Practices**

Mr. Knight alleges claims for unlawful employment practices in violation of 42 U.S.C. § 1983 against King County, Ms. Brown, Mr. Faquir, Mr. Stamper, Mr. Kenoyer, and Mr. Willard.  To state a claim under § 1983, a plaintiff must prove that a defendant, while acting under the color of law, deprived him or her of the rights secured by the Constitution or laws of the United States.  *West v. Atkins*, 487 U.S. 42, 48 (1988).  For individual liability, the defendant must have played an "integral" role in and been personally responsible for the deprivation.  *Jones v. Williams*, 297 F.3d 930, 934-35 (9th Cir. 2002).  Because § 1983 suits do not allow for the imposition of vicarious liability, a plaintiff making a claim against a government official in his or her individual capacity requires a showing that each government official defendant, through his or her own individual actions, has violated the Constitution.  *See Starr v. Baca*, 633 F.3d 1191, 1195 (9th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. at 1948).

As a threshold matter, Mr. Knight's counsel stated at oral argument that Mr. Knight makes no claims under § 1983 that are distinct from his claims under Title VII, § 1981, and WLAD.  Thus, because the court has determined that summary judgment is appropriate (1) on Mr. Knight's Title VII, § 1981, and WLAD claims for hostile work

environment and retaliation against all Defendants, and (2) on Mr. Knight's Title VII and § 1981 claims for disparate treatment against Mr. Stamper, Mr. Kenoyer, Ms. Brown, and Mr. Faquir, the court grants those Defendants' motion for summary judgment on Mr. Knight's corresponding claims under § 1983. The court turns, therefore, to whether Mr. Knight's claims for violations of § 1983 against Mr. Willard and King County survive summary judgment.

### 1. Mr. Willard

Mr. Knight states that the elements of his § 1983 claim against Mr. Willard mirror his Title VII claim for disparate treatment. (Willard Resp. at 12; *see also* Willard Reply (Dkt. #73) at 8 n.1.) Because the court denied Mr. Willard's motion for summary judgment on Mr. Knight's disparate treatment claim under Title VII, the court also denies Mr. Willard's motion for summary judgment on Mr. Knight's disparate treatment claim under § 1983.

### 2. King County

Mr. Knight contends that King County is liable for unlawful employment practices under § 1983 because an employee with final policymaking authority, Ms. Brown, committed or ratified the discriminatory acts. A municipal entity may be held liable under § 1983 for its employees' actions where one of its customs or policies caused a violation of the plaintiff's constitutional rights. *Delia v. City of Rialto*, 621 F.3d 1069, 1081 (9th Cir. 2010). Even in the absence of an official policy or custom, "an unconstitutional government policy [can] be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business."

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). "Under this paradigm, however, 'municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" *Delia*, 621 F.3d at 1081 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). With respect to the "final policymaker" prong, the Supreme Court has made clear that the "fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Pembaur*, 475 U.S. at 481-83 (citations and footnote omitted).

Mr. Knight asserts that Ms. Brown was acting as a final policymaker when she committed, participated in or ratified discriminatory acts. (KC Resp. at 23.) Mr. Knight, however, does not identify which of Mr. Willard's discriminatory acts Ms. Brown committed, participated in, or ratified. (*See id.*) In any event, even if Ms. Brown did commit, participate in, or ratify discriminatory acts, she is not an official with "final policymaking authority" for King County.

Mr. Knight relies on King County Code section 2.16.020(D) for the proposition that Ms. Brown, as director of FMD, had final policymaking authority. This section, however, states that "[t]he director of each executive department, chief officer of each administrative office, and manager of each division may exercise the powers vested in that department, administrative office, or division." KCC 2.16.020(D). Thus, section 2.16.020(D), by its terms, limits the director of the FMD to the powers vested in that

division.  Moreover, as the King County Defendants point out, King County Charter section 520 provides that only the King County Executive and the County Council can set King County's employment policies regarding personnel rules.  (*See* KC Reply at 15; Brown Decl. Ex. C.)  Thus, although Ms. Brown may exercise discretion in hiring, firing, and managing employees within FMD, the King County Code and King County Charter do not vest final policymaking authority with respect to employment practices in Ms. Brown.  The court therefore grants King County's motion for summary judgment on Mr. Knight's § 1983 claims.

**F.     Failure to Pay Wages**

Mr. Knight alleges a claim for failure to pay wages against King County.  Under RCW 49.52.050(2), an employer who "[w]ilfully and with intent to deprive the employee of any part of his wages, shall pay any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract" may be liable to the employee "for twice the amount of the wages unlawfully rebated or withheld" along with costs and reasonable attorney's fees.  RCW 49.52.050(2), 49.52.070.

Mr. Knight claims that he was entitled to be paid wages at the pay rate for a sergeant, but that King County willfully and with the intent to deprive him of the pay he was entitled to, paid him a lower rate than he was entitled to when he was unlawfully demoted.  (Am. Compl. ¶¶ 102-105.)  Mr. Knight conceded at oral argument that if the court determines that summary judgment is appropriate on his retaliation claims, then his

1   failure to pay wages claim also falls.  The court therefore grants King County's motion

2   for summary judgment on Mr. Knight's claim under RCW 49.52.050(2).

3                    **III.    CONCLUSION:**

4           For the foregoing reasons, the court GRANTS in part and DENIES in part the

5   King County Defendants' motion for summary judgment (Dkt. # 66) and GRANTS in

6   part and DENIES in part Mr. Willard's motion for summary judgment (Dkt. # 46).

7           Dated this 27th day of June, 2011.

8

9                                        _____

10                                       JAMES L. ROBART
                                         United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22